Filed 5/26/16  P. v. Soto CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G050508 |
| v. | (Super. Ct. No. 12CF0107) |
| ANDRES SOTO, JR., and RICHARD VALDEZ, | O P I N I O N |
| Defendants and Appellants. | |

Appeal from judgments of the Superior Court of Orange County, W. Michael Hayes, Judge.  Affirmed.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant Andres Soto, Jr.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant Richard Valdez.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

Over a nine-week period in late 2011 and early 2012, Paul Acosta, Jr., robbed five banks in Orange County. All of the robberies occurred at bank branches located in supermarkets, and on each occasion Acosta was accompanied by a confederate who provided backup. Following his arrest, Acosta told the police appellant Andres Soto, Jr., backed him up during the first four robberies, and appellant Richard Valdez backed him up during the fifth robbery. Although appellants' criminal activity did not overlap as to any of the charged offenses, they were tried together in a single trial and convicted of multiple, albeit separate, crimes.

Because appellants were not jointly charged in any of the alleged offenses, Valdez contends his trial attorney was ineffective for failing to request a separate trial for him. Valdez also contends the trial court erred in failing to instruct the jury to view his extrajudicial statements with caution and in giving the standard flight instruction. Soto does not challenge his underlying convictions. Rather, he contends the trial court abused its discretion and violated the constitutional prohibition against cruel and unusual punishment by sentencing him to 140 years to life in prison. Finding appellants' contentions unmeritorious, we affirm their judgments.

FACTS

*The Robberies Involving Soto*

In October 2011, a man walked into a La Habra bank and demanded money from teller Sandra Aguilar. When Aguilar refused to turn over any cash, the man directed her attention to his partner, who was standing behind him. Because this second man was holding his hand inside a bag to make it look like he had a gun, Aguilar surrendered about $1,700. She also activated the bank's alarm system, but the robbers fled the scene and got away. As part of their investigation, the police showed Aguilar and another bank employee who was present during the robbery several photographic lineups. They identified Acosta as the first robber and Soto as his partner.

2

A week later, on November 3, 2011, Kimberly Houser was working at a bank in Seal Beach when a man approached her window and ordered her to give him all her money. Houser tried to stall, but when a second man approached her with what appeared to be a gun in a bag, she handed over $3,000. The men also obtained about $2,500 from a second teller before fleeing the scene. When shown a series of photographic lineups, Houser identified Acosta and Soto as the robbers.

The third robbery played out in similar fashion. On November 21, 2011, two men entered a Wells Fargo branch in Placentia. The first man demanded cash from tellers Marcus Bowman and Stephen Hernandez, and when they were slow to respond, the second man acted like he had a gun inside the bag he was holding and threatened to shoot them. Fearing for their lives, the tellers surrendered over $4,000 to the robbers, who fled the scene. Bank manager David De La Mora, who was also present during the robbery, identified Acosta from a photographic lineup as the first robber.

The final robbery involving Soto took place on December 10, 2011 at a Lake Forest bank. A man approached the tellers and demanded money while his nearby partner positioned his hand inside a bag to make it look as though he had a gun. The men also threatened to shoot the tellers if they tried anything funny. The tellers surrendered $3,000 to the robbers, who were later identified in photo lineups as Acosta and Soto.

*The Robbery Involving Valdez and Acosta's Arrest*

On January 5, 2012, Jamie Glasser White was working at the same bank in Placentia that had been the target of the third robbery. A man approached White's window and demanded her till money. After she surrendered about $2,000, the man turned and ran away with another man. White did not see the second man's face, but she did identify Acosta from a photographic lineup as the man who robbed her. Branch manager Ken Nguyen was also present during the robbery. However, like White, he did not notice the second man until the robbers were running away, so he was likewise unable to provide a description of the second robber.

3

But Damian Palacio, the bank's customer greeter, had direct contact with the second robber. While Acosta was getting the loot, the second robber tried to block Palacio so he could not see what was going on at White's window. In the process, he came face-to-face with Palacio. After the robbers fled, Palacio followed them out of the bank and saw them get into a black Dodge Charger. He called the police and gave them a description of the vehicle and the robbers. Palacio described the second robber as a 25- to 30-year-old Hispanic who was about five-foot eight, 125 pounds and bald. He also said the second robber was wearing black gloves and a Milwaukee Brewers baseball cap and had a blue bandana over his face.

The police spotted the robbers' car as it was leaving the bank and pursued it at high speeds to a residential area of Los Angeles County. When the car finally came to a stop, the robbers fled on foot. The second robber got away, but Acosta was found in a nearby carport. Rather than surrender peacefully, he brandished a pellet gun and was shot by the police several times before being taken into custody. Inside the robbers' car, the police found a blue bandana and a pair of dark gloves. They also discovered a Milwaukee Brewer's cap that carried Valdez's DNA.

While Acosta was in the hospital recovering from his gunshot wounds, the police questioned him about the robberies. He admitted he committed the first four robberies with Soto, and said he committed the fifth and final robbery with Valdez. All three men were charged in a single complaint with multiple counts of robbery and burglary. The first 14 counts – pertaining to the first four robberies – identified Acosta and Soto as the perpetrators. Counts 15 thru 17 – pertaining to the fifth robbery – named Acosta and Valdez. And count 18 accused Acosta alone of recklessly evading the police.

*The Trial*

Acosta turned state's evidence and pleaded guilty to six of the charges in exchange for a six-year prison term. At trial, he testified that he and Soto committed the first four robberies to get money to support their heroin addictions. During the robberies,

4

Soto's job was to stand behind Acosta and back him up. Soto kept his hand inside a bag to give the impression he had a gun, although – according to Acosta – he did not actually have one.

Describing his relationship with Valdez, Acosta testified they met at a drug treatment facility in 2008. They were just acquaintances then, but in 2011, they crossed paths again, and Valdez became his friend and drug dealer. In fact, Valdez sold him about $150 worth of heroin every day. The sales took place in a variety of places, including inside the Dodge Charger that was used as the getaway car for the fifth robbery. Asked why he committed that robbery with Valdez instead of Soto, Acosta said Soto "had disappeared" by that time, and he owed Valdez about $100 from their drug sales. Acosta figured that if he and Valdez robbed a bank together, he could pay back Valdez and they could split the remaining proceeds 50/50. When Acosta floated this idea to Valdez, Valdez agreed to join him in the heist.

During the robbery, Valdez stood behind Acosta in a backup position. Their plan was for Valdez to pretend he had a gun in a bag, but he did not bring anything into the bank. While they were fleeing from the police, Valdez called his girlfriend in Norwalk and directed Acosta to her house so they could take refuge there. But by the time they arrived in her neighborhood, the police were hot on their trail, so they made a run for it. Unable to keep up with Valdez, Acosta tried to hide, but the police tracked him down. He was so disturbed by being caught that he flashed a pellet gun at the police in the hope of committing "suicide-by-cop." However, the wounds he sustained were not fatal. When the police spoke to him later on at the hospital, he was a "little woozy" because he was being administered morphine at the time.

On cross-examination, Acosta admitted he was a long-time thief and drug addict. He also admitted that as part of his plea agreement he received leniency from the prosecution in exchange for testifying against appellants at their trial. Because the

5

maximum prison exposure for his crimes was "upwards of 20 years," Acosta was happy to take the deal for a six-year term.

Soto did not present any evidence in his defense. However, Valdez took the stand and denied the charges against him. He admitted to being a drug dealer and having suffered convictions for crimes involving moral turpitude in 1988 and 2003. Acosta was one of his clients, but he also sold drugs to others. All told, he was making over $1,000 a day – and sometimes up to $5,000 a day – during the period when the fifth robbery occurred, so he had no reason to rob a bank with Acosta to recoup the $100 that Acosta owed him.

Valdez admitted the Brewers cap found in the getaway car was his. Explaining how it got there, Valdez said that during the second half of 2011 he regularly sold Acosta drugs in the car once or twice a week. On many of those occasions, he inadvertently left behind items such as hats and bandanas (which he used to package the drugs). Asked if he ever hung out with Soto during that time, Valdez said he did not even know who Soto was until he was charged with him in this case.

In the end, the jury convicted Soto of eight counts of robbery and four counts of burglary, and it convicted Valdez of two counts of robbery and one count of burglary. In addition, the trial court found true allegations appellants had each suffered multiple prior felony convictions and served multiple prior prison terms. The court sentenced Soto to 140 years to life in prison, and it gave Valdez 40 years to life.

## DISCUSSION

### *Effectiveness of Valdez's Attorney*

Valdez contends that because he was not jointly charged with Soto in any of the charged counts his attorney was ineffective for failing to seek a separate trial. We disagree.

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness

6

under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. [Citations.]' . . . [citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 206-207.)

As our Supreme Court has explained, "It is particularly difficult to prevail on an *appellate* claim of ineffective assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. [Citation.] Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.)

Valdez is correct that severance is generally required in cases where the defendants are not jointly charged in at least one of the alleged offenses. (*People v. Ortiz* (1978) 22 Cal.3d 38, 43.)[1] But the record does not contain any explanation as to why Valdez's attorney failed to seek a separate trial. Perhaps he wanted his client to look good compared to Soto, who was charged with committing four bank robberies. Or perhaps he thought Soto might make a good scapegoat for Valdez with respect to the one robbery with which Valdez was charged. The point is, this is not a situation where there

---

[1]  An exception to that rule exists when the subject offenses are committed against the same victim, at the same time and as part of the same transaction. (See, e.g., *People v. Wickliffe* (1986) 183 Cal.App.3d 37, 40-41; *People v. Hernandez* (1983) 143 Cal.App.3d 936, 938-941.) However, as the Soto and Valdez robberies occurred against different victims, at different times, and involved entirely separate transactions, this case does not fall within that exception. Nor is it analogous to *People v. Stathos* (1971) 17 Cal.App.3d 33, upon which respondent relies, because unlike here, the defendants in that case were jointly charged in at least some of the charged counts. (*Id*. at pp. 35, 41.)

7

could be no plausible explanation for counsel's alleged deficiency. Therefore, we reject Valdez's ineffective assistance of counsel claim and leave him to pursue a petition for a writ of habeas corpus. (*People v. Gray, supra*, 37 Cal.4th at p. 210; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

*Absence of CALCRIM No. 358*

Valdez also asserts the trial court should have instructed the jury per CALCRIM No. 358 to view his extrajudicial statements with caution. He identifies his statements directing Acosta to drive to his girlfriend's house after the robbery as being covered by the instruction. However, Valdez did not ask the trial court to give CALCRIM No. 358, and the trial court was not required to give it on its own accord because it had instructed the jury on the general factors affecting witness credibility. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1188-1195.) Therefore, no error occurred. (*Ibid.*)

Even if the failure to give CALCRIM No. 358 were improper, the omission would be harmless because the jury was instructed to view Acosta's testimony, which included the statements Valdez made to him while they were fleeing the bank, with caution. (*People v. Diaz, supra,* 60 Cal.4th at p. 1198.) Under these circumstances, it simply is not reasonably likely Valdez would have obtained a more favorable verdict had CALCRIM No. 358 been given. (*Id.* at p. 1195.)

*The Flight Instruction*

Valdez's final contention is that the trial court erred in instructing the jury it could infer guilt from his flight after the robbery because there was no independent evidence he was actually the person who was in the getaway car with Acosta. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1245.)[2] By independent evidence, Valdez means evidence apart from the evidence which implicated him as the perpetrator of the

---

[2] Although Valdez did not object to the court's flight instruction, we will consider his claim because the instruction arguably affected his substantial rights. (Pen. Code, § 1259.)

8

robbery.  However, Acosta not only testified Valdez helped him commit the robbery, he also testified Valdez was with him afterwards when he fled from the police.  In addition, independent DNA evidence connected Valdez to the baseball cap that was found in the getaway car after the robbery.  Thus, there was sufficient evidence to support the flight instruction.

*Soto's Claims*

Given Soto's criminal history, including three prior "strike" convictions (Pen. Code, §§ 667, subds. (d), (e)(2)(A), 1170.12, subds. (b)(c)(2)(A)) and two prior serious felony convictions (§ 667, subd. (a)(1)), the trial court sentenced him to an aggregate prison term of 140 years to life.  Soto contends the court abused its discretion in refusing to dismiss two of his prior strikes, and his sentence is cruel and unusual under the state and federal Constitutions.  Neither contention has merit.

Soto's first strike arose back in 1983, when he was convicted of residential burglary.  He was given probation for that offense, but in 1988, and again in 1990, he was sentenced to prison for committing theft.  In 1993, he was convicted of two counts of bank robbery, which constituted his second and third strikes and landed him back in prison for nearly a decade.  But after he was released from custody he suffered multiple drug-related arrests and was convicted of driving on a suspended license (2007) and possessing a controlled substance (2011).  His performance on parole has been poor, and while he was awaiting trial in the present case he was reprimanded by jail officials for eight rule violations.

Given Soto's lengthy criminal record, including his 12 felony convictions in the instant case, it is hardly surprising the trial court declined his invitation to dismiss any of his prior strikes pursuant to Penal Code section 1385.  That section gives sentencing judges discretion to dismiss one or more of the defendant's strike convictions if it would further the ends of justice.  (Pen. Code, § 1385, subd. (a); *People v. Superior Court (Romero)* 13 Cal.4th 497, 507-508.)  In deciding whether that standard is met in a

9

given case, the court must consider both the constitutional rights of the defendant and the societal interest in ensuring the fair prosecution of criminal cases. (*Id*. at p. 530.) Ultimately, the court must determine "whether, in light of the nature and circumstances of his present felonies and prior . . . convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [spirit of the Three Strikes law], in whole or in part, and hence should be treated as though he had not previously been convicted of one or more [strikes]." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

The trial court's refusal to dismiss a prior strike conviction is reviewed for an abuse of discretion – a most deferential standard. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.) Only in "an extraordinary case – where the relevant factors described [above] manifestly support the [dismissing] of a prior conviction and no reasonable minds could differ" would the failure to dismiss constitute an abuse of discretion. (*Id*. at p. 378.)

This is not such a case. In fact, the experienced sentencing judge described Soto's present crimes as "reprehensible" and said his criminal record was "one of the worst" he had ever seen. That's saying something. Soto argued his lengthy record was mitigated by his long history of drug addiction, which allegedly "fueled" his unlawful behavior. But as the trial court noted, there is no evidence Soto has ever sought treatment for his drug problem, so it is hard to be sympathetic to his plight. He does not come off as a person who has tried but failed to overcome his problem but as someone who has simply given in to it. The fact that in the present case he engaged in the same type of dangerous conduct for which he had previously served nearly 10 years in prison is particularly troublesome. Considering Soto's lengthy and serious criminal record — and the fact his previous incarcerations seemed to have made no impression on him — we do not believe the court abused its discretion in refusing to dismiss any of his prior strike

10

convictions. The court's decision fully comports with both the letter and the spirit of the Three Strikes law, and we see no reason to disturb it.

For largely the same reasons, Soto's sentence does not violate the constitutional proscription against cruel and unusual punishment. (See U.S. Const., 8th Amend.; Cal. Const., art. 1, § 17.) The United States Supreme Court has made it clear that absent gross disproportionality in the defendant's sentence, no Eighth Amendment violation will be found. (See, e.g., *Ewing v. California* (2003) 538 U.S. 11 [upholding 25-years-to-life sentence for grand theft with priors]; *Lockyer v. Andrade* (2003) 538 U.S. 63 [upholding 50-years-to-life sentence for petty thefts with priors].) Similarly, a sentence will not be found unconstitutional under the state Constitution unless it is so disproportionate to the defendant's crime and circumstances that it shocks the conscience or offends traditional notions of human dignity. (See *People v. Dillon* (1983) 34 Cal.3d 441; *In re Lynch* (1972) 8 Cal.3d 410, 424.) We cannot find such disproportionality here.

In assessing proportionality, we must keep in mind, "The purpose of a recidivist statute . . . [is] to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time. This segregation and its duration are based not merely on that person's most recent offense but also on the propensities he [or she] has demonstrated over a period of time during which he [or she] has been convicted of and sentenced for other crimes. Like the line dividing felony theft from petty larceny, the point at which a recidivist will be deemed to have demonstrated the necessary propensities and the amount of time that the recidivist will be isolated from society are matters largely within the discretion of the punishing jurisdiction." (*Rummel v. Estelle* (1980) 445 U.S. 263, 284-285.)

As recounted above, Soto's criminal record is both extensive and serious. His multiple forays into the criminal justice system have had little effect on his behavior, and he has clearly demonstrated the necessary propensities to warrant an extended

11

commitment. We do not believe his sentence is unconstitutionally disproportionate under state or federal law. (*People v. Haller* (2009) 174 Cal.App.4th 1080 [upholding Three Strikes sentence of 78 years to life]; *People v. Retanan* (2007) 154 Cal.App.4th 1219 [upholding Three Strikes sentence of 135 years to life]; *People v. Byrd* (2001) 89 Cal.App.4th 1373 [upholding Three Strikes sentence of 444 years to life]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123 [upholding Three Strikes sentence of 375 years to life].)

DISPOSITION

The judgments are affirmed.

BEDSWORTH, ACTING P. J.

WE CONCUR:

ARONSON, J.

THOMPSON, J.

12